## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**JAMES W. HARPER,**
      **Plaintiff,**

                                              **CASE NO. 2:12-CV-00049**
    v.                                  **JUDGE EDMUND A. SARGUS, JR.**
                                              **MAGISTRATE JUDGE NORAH M. KING**

**NORFOLK SOUTHERN RAILWAY**
**COMPANY,**
        **Defendant.**

### OPINION AND ORDER

Plaintiff, James W. Harper, brings this action against Defendant, Norfolk Southern Railway Company, pursuant to the Federal Employers' Liability Act ("FELA"). 45 U.S.C. §§ 51–60. He alleges that he sustained personal injuries as a result of Defendant's negligence in violation of the Code of Federal Regulations. This matter is now before the Court for consideration of Plaintiff's motion for partial summary judgment as to his claim under 49 C.F.R. § 218.103. Doc. 69. For the reasons below, the Court **GRANTS** Plaintiff's motion.

### I. BACKGROUND

Plaintiff has worked for Defendant, a railway company, since July of 1999. Doc. 70-1 at 15. He started as a conductor and then earned a promotion to engineer in 2006. *Id.* at 15–16. Engineers work with conductors and utility brakemen to transport train cars to and from designated railroad-yard depots. *See id.* at 17–18; *id.* at 36–37.

Plaintiff was working as an engineer when he reported to work on August 18, 2010. *Id.* at 38. He worked third shift, showing up to work at 10:00 p.m. *See id.* Harper worked what the parties call the "L-65" job—taking cars back and forth between Defendant's Moraine Yard and Reed Yard. *Id.* at 17; *id.* at 38. His crew that night had two additional members: Joseph

Capozzolo ("Capozzolo") as the conductor and David Schreiber ("Schreiber") as the utility brakeman. *Id.* at 36. The crew received a short set of instructions for the job that night and then travelled toward Reed Yard, *see id.* at 39, 14 miles from Moraine, *id.* at 41. Upon pulling into Reed, the crew was directed down track 24. *See, e.g., id.* at 45–46. Plaintiff and his crew ran into a problem as they pulled into track 24: not all of their cars fit.

Reed's yardmaster directed the crew to place the remainder of the cars into track 25. *Id.* at 46. The crew had to take several steps to do so. First, the crew made a "cut"—a separation between the cars that fit in track 24, and the rest of the cars that needed to be funneled onto track 25 (Plaintiff testified in his deposition that he did not know how many cars remained attached to his car after the cut, although he learned after the incident that the number was eight, *see* doc. 70-1 at 53); step one happened without incident. *See id.* at 46–50. Second, the crew and its remaining cars had to be funneled onto a holding track, what the parties call a "lead" track; step two also happened without incident. *See id.* at 50.

The third step involved the conductor, Capozzolo, hitting the proper switches to direct the cars onto the proper track. Switch alignment is important enough that Defendants have two rules to minimize risk. One rule, known as "NS Operating Rule 104," reads in relevant part:

> The position of a switch or derail being used is the responsibility of the employee handling it. This does not relieve other crew members of responsibility if they are in place to observe the positions of switches and derails.

Employees operating switches by hand must ensure:

- switches are properly lined for the movement to be made

- switch points fit up properly

- each switch is secured by placing lock or hoop in hasp, if equipped

> Switches and derails must be properly lined and secured after having been used.

Doc. 70-7 at 1.[1] The other rule mandates a crew double check whether the switches have been

properly aligned. Known as "LA-509" or a "double check," the rule reads as follows:

> When using radio communication to make noncontinuous switching moves, shove moves, setouts, pickups or couplings: After switches and derails connected with movement are properly lined, the employee directing the move will communicate this information to the Engineer. The Engineer will acknowledge the information and advise the employee directing movement to double-check the alignment of the switches and/or derails. Until notified again that the switches and derails are properly lined, the Engineer must not make a movement. Additionally, the Engineer must not move until he is given a direction of move and distance seen or known to be clear.

Doc. 70-8; *see also* doc. 70-1 at 61 (Plaintiff verifying that the double check as "part of the Lake

Division rules that you have to abide by when working the Lake Division").

Plaintiff testified several times at his deposition that he initiated a double check, *see, e.g.*,

doc. 70-1 at 59–60, and that Capozzolo responded by giving him "the green light" to move onto

track 25, *id.* at 59. Capozzolo testified that Plaintiff did not initiate a double check. Doc. 70-3 at

34. Also, Capozzolo was asked in his deposition whether he properly aligned—and ensured that

he aligned—the track 24 switch back to the lead. This led to the following exchange:

> Q    First of all, tell me why you don't look at banners.

---

[1] Plaintiff asserts that Defendant enacted NS Operating Rule 104 to comply with 49 C.F.R. § 218.103(a)(1). Defendant does not challenge this assertion. For support, Plaintiff points to the following interrogatory-and-answer exchange:

> 1. At the time of the August 19, 2010 incident, please identify each operating rule which had been enacted by Defendant to comply with the requirements of 49 C.F.R. § 218.103.

**Answer**

> Objection. Vague and ambiguous as to meaning of "operating rule". There are rules and specific instructions contained, for example, in the Lake Division Time Table. This Interrogatory also arguably calls for a legal conclusion. Without waiving these objections, and subject thereto, the Norfolk Southern operating rule primarily relating to 49 C.F.R. § 218.103, as it relates to the activities of the train crew at the time of the alleged incident, was Operating Rule 104.

Doc. 70-9 at 4.

A       I'll tell you why, because I've seen banners that guys have messed around with and taken them off and changed them around.

Q       Okay.  Well, that may be why you're supposed to look at the points, correct?

A       Oh, absolutely.

Q       But you didn't do that either?

A       Apparently, I did not.

Q       Okay.  The—you say, apparently, I did not because I take it you mean that if you had, you would have not brought them back?

A       Absolutely.

Q       Okay.

A       We wouldn't be sitting here.  I wouldn't have been disciplined, and we wouldn't be sitting here.

        . . . .

Q       Okay.  And I—

A       What I'm saying is I walk the lead.  I don't—I don't assume anything.  I walk the leads.  I make sure everything is—I make sure I have a lineup before I even make a movement.

Q       Okay.  I understand what you're saying, Joe.

A       Sure.

Q       And, obviously, you said we wouldn't be here today if you had checked that lineup.

A       I did.

Doc. 70-3 at 38–40.

Thinking the coast was clear, Capozzolo "gave the okay to start" the movement—known as "the shove"—onto track 25.  *Id*. at 59.  NS Operating Rule 509 governs employee conduct with respect to shove movements.  It reads, in relevant part:

(b) The distance of the movement must be specified in 50 foot "car lengths" and the movement must stop in one-half the distance last received unless additional instructions are received.

EXCEPTION: When within five car lengths of the coupling or stop, the person directing the move will call out distances in car lengths:

- "five cars"
- "four cars"
- "three cars," etc.

After acknowledging "five cars," the Engineer will not be required to further acknowledge countdown if so doing would interference with safe operating. During this countdown, the Engineer will stop the move immediately after moving one car length unless receiving additional signals from the person directing the move.

Doc. 70-2 at 1–2. As Plaintiff told it in his deposition, Capozzolo gave the indication that he was clear to move five train-car lengths toward track 25. Doc. 70-1 at 60. Plaintiff further testified that he "started moving, and then [Capozzolo] was like—I don't know if he was walking or what, he said, I'll give you clear for another ten, so he went from five cars to ten cars." *Id.* Capozzolo in his deposition confirmed the accuracy of a written statement he gave two days after the accident. *See* doc. 70-3 at 14. In that written statement, Capozzolo wrote that he told Plaintiff he was "lined for the # 25 [track]," and to "start back 5 cars or maybe 10." Doc. 70-4 at 1; *see* doc. 70-3 at 42 (Capozzolo deposition) (recalling that he told Plaintiff to start shoving "back five or ten cars into Track 25"). Capozzolo then wrote that the "utility brakeman," Schreiber, told Plaintiff that they "should be good for at least 10 cars." Doc. 70-4 at 2.

Unlike the first two steps, step three did not go off without a hitch. The crew intended for Capozzolo to direct Plaintiff and his attached cars onto the lead track and then, once all there, onto track 25. *See id.* at 54. Capozzolo thought he aligned the 25 switch properly. Doc. 70-3 at 34. Although Capozzolo thought the switches would funnel Plaintiff and his attached train cars onto track 25, they did not. The switch was still aligned to track 24, meaning Plaintiff

5

unexpectedly shoved the attached cars back into the detached cars. Doc. 70-3 at 44. The impact knocked Plaintiff out of his seat. Doc. 70-1 at 67–68. As a result, Plaintiff sustained injuries to his neck and shoulder. The documents submitted by the parties do not indicate a specific neck-injury diagnosis, only that Plaintiff continued to experience pain after the accident. *See, e.g.*, *id.* at 107–12. Plaintiff sustained a separated shoulder, which later required surgery. *See id.* at 92; *id.* at 99.

The involved parties filed post-incident reports. For his part, Plaintiff filled out a personal injury report the day after the accident. It reads in its entirety:

> Working L-65[.] Heading into Reed Yard [and] went up [t]hrough 24 track[.] There was an overflow of 8 cars?? They were to go in 25 Track[.] Pulled up[.] Conductor said come on back for 25[,] clear[,] no cars[.] Stated shoving back[,] moved 4 to 5 cars and slammed into cars [t]hat were [i]n 24[.] Was [t]hrown [f]rom seat[.] Not [r]eal sure what I [h]it.

Doc. 73-1. On August 21, 2010, Conductor Capozzolo submitted his own written statement, in relevant part:

> Came in for Track #24, with excess cars to Track #25. 8 cars overflow to Track #25, brakes at the west end, made cut, proceeded to switch at east end. Track #24, had lined Track #25, for our move. Apparently did not line #24 Track back to lead. Do not remember double check, said lined for Track #25 clear to start back 5 cars or maybe 10. Reminded Engineer[] that there were cars in Track #25. Utility Brakeman stated that we should be good for at least 10 cars. Engineer started back, within 4 cars to 5 cars. As I turned, the 8 cars for Track #25 were heading back to the cars in Track 24. We ran into the cut. . . .

Doc. 70-4 at 1–2; *see also* doc. 70-6 at 19.

Defendant's Trainmaster, Joseph H. Williams, Jr., also conducted a post-accident investigation. At the conclusion of the investigation, Williams appeared at an internal meeting regarding the incident. In addition to answering questions, Williams "gave a recorded statement concerning the incident," doc. 70-5 ¶ 1:

After they pulled into 24, got the clearance point, the utility started to put the handbrakes on. Mr. Capozzolo dismounted the engine, went back to the clearance point to make the cut in 25. He then went over to the 25 Switch to bring the train back—the balance of the train, rather, back into 25. It was eight cars and two engines. He went to the 25 Switch. He informed Mr. Harper that he was clear for ten cars and told him to proceed back. . . .

. . . .

As I stated, Mr. Harper stated that he asked for and received a double check and initiated the shove move back into he thought was Track 25. Shortly thereafter, he collided—his train collided with the cars that were in 24 because the #24 Switch had not been touched. It was still lined for 24. So after having pulled out to clear it and he shoved back into 24 again, impacted the cars that he left there where in he was thrown from his seat into either the window or the upright heater in the unit. . . .

Doc. 70-6 at 1–2. Williams also found, based on "speed tape data," that Plaintiff's shove move onto what he thought was track 25 (but turned out to be track 24) was 316.8 feet, and that Plaintiff was traveling at "7 miles per hour at the moment of impact." Doc. 70-6 at 27; *see also* doc. 70 at 8 (Plaintiff's motion for summary judgment, describing this information as having come from "event recorder data taken from the engine Plaintiff was operating"); doc. 73 at 4 (referring to how far Plaintiff shoved "based on the event recorder data").

Finally, Williams' statement at the hearing included a summary of his conclusions about the accident:

From my investigation, it would appear that the incident occurred specifically because Mr. Capozzolo failed to properly line his route. And in addition, he didn't properly protect his shove move. During my interview with Mr. Capozzolo and from his statement, when he went to the 25 Switch, he gave the clearance to Mr. Harper that he was clear for ten cars in the 25. He stated that he was expecting the double check. He didn't remember getting one. But he turned his back to the move to inspect the switch. And when he turned back around, he heard engines. When he turned back around, they were already going into 24. Mr. Capozzolo said he didn't have time. He didn't make any attempt to stop Mr. Harper. He said it was too late at that point, so he witnessed the collision with the eight cars and two engines going back into the cars that he had left at 24 already. And, like I said, as a result of that, my investigation told me that Mr. Capozzolo failed to properly line his route prior

7

> to his move. And again, by turning his back to the move, he failed to properly protect his shove. And those things directly contributed to the injury of a fellow employee.

Doc. 70-6 at 8.

Based on the accident, Plaintiff brought suit in this Court in January of 2012. Doc. 2. Within his initial Complaint, Plaintiff alleged that Defendant was liable under FELA for negligence. Plaintiff amended his complaint in November of 2012 to add a negligence *per se* theory, maintaining that he was entitled to damages under FELA based on Defendant's violation of 49 C.F.R. § 213.135(g), relating to switch banners. Defendant successfully moved for partial summary judgment as to this part of Plaintiff's case. Plaintiff then amended his complaint again, this time adding a new negligence *per se* theory based on an alleged violation of 49 C.F.R. § 218.103. Plaintiff now moves for partial summary judgment for his claim that, at the time of the alleged accident, Defendant was in violation of 49 C.F.R. § 218.103.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is

a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52.

### III. DISCUSSION

Plaintiff limits his motion for summary judgment to his FELA claim relating to 49 C.F.R. § 218.103. The Court deals with this motion in two parts. First, the theory behind Plaintiff's claim is not established law in this circuit, and thus requires more explanation. Second, the Court turns to the merits of the parties' arguments over whether summary judgment is appropriate in this case.

#### A. FELA's Application to this Case

Three areas of law provide the substantive basis for the claim: 49 C.F.R. § 218.103, FELA, and negligence *per se*. Section 218.103 is a track-safety regulation. It mandates that railroads adopt and follow certain operating rules; and it states that a violation of an operating rule adopted in compliance with the regulation amounts to a violation of the code itself. *See* 49 C.F.R. § 218.103(a)(1). Plaintiff ties his section 218 claim to FELA and negligence *per se*. Congress enacted FELA in response to the dangers of railroad work and to shift some of the burden of these dangers to railroad employers. *CSX Transp., Inc., v. McBride*, 131 S. Ct. 2630,

9

2636 (2011). FELA holds a common carrier engaged in interstate commerce liable for employee injuries "resulting in whole or in part from the negligence of any officers, agents, or employees of such carrier." 45 U.S.C. § 51. For the purposes of FELA, it is well established that "[a] railroad's violation of a safety statute . . . is negligence *per se*." *McBride*, 131 S. Ct. at 2643 n.12; *Lynch v. Ne. Reg'l Commuter R.R. Corp.*, 700 F.3d 906, 911 (7th Cir. 2012) ("FELA imposes strict liability on railroad carriers who violate certain safety statutes . . . ."). To summarize, Plaintiff asserts that the violation of a regulation, here 49 C.F.R. § 218.103(b)(4), functions as the violation of a "safety statute" under FELA, which itself amounts to negligence *per se* under *McBride*.

The claim faces a few problems at first glance. First, 49 C.F.R. § 218.103 is a regulation promulgated under the Federal Railroad Safety Act ("FRSA"), *see* 49 U.S.C. § 20101 *et seq.*, a different federal act than FELA. Second, 49 C.F.R. § 218.103 is a regulation, not a statute. *See McBride*, 131 S.Ct. at 2644 ("A railroad's violation of a safety *statute* . . . is negligence *per se*." (emphasis added)). Both of these problems contribute to the same overarching question: can Plaintiff proceed with a FELA negligence *per se* claim for the alleged violation of a FRSA regulation? Plaintiff argues yes and Defendant does not contest the matter.[2] This circuit has not directly ruled on the issue.

Despite this, the Court holds that Plaintiff may proceed with his claim that the violation of 49 C.F.R. § 218.103—a FRSA regulation—could constitute negligence *per se* under FELA. Several factors inform this conclusion. First, FRSA and FELA are closely related. FRSA has a

---

[2] Plaintiff, as the Court explains below, may proceed with his claim. The Court does note that one of his arguments for the propriety of his FELA claim fails to convince. Plaintiff asserts that Congress has deemed FRSA regulations to be safety statutes for the purposes of FELA, and he cites 45 U.S.C.A. § 54a. Doc. 70 at 12. The provision he cites, 45 U.S.C.A. § 54a, reads in relevant part: "A regulation, standard, or requirement in force, or prescribed by the Secretary of Transportation under *chapter 201 of Title 49* . . . is deemed to be a statute under sections 53 and 54 of this title." 45 U.S.C.A. § 54a (emphasis added). Although this provision specifically references chapter 201 of Title 49, Plaintiff brings his claim pursuant to a different chapter—218—of Title 49.

similar purpose: "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." *Nickels v. Grand Trunk W. R.R., Inc.*, 560 F.3d 426, 429 (6th Cir. 2009). FRSA allows "the Secretary of Transportation . . . prescribe regulations and issue orders for every area of railroad safety." *Nickels*, 560 F.3d at 429 (internal quotation marks omitted). Applicable to this case, the Secretary of Transportation promulgated the regulation at issue here, 49 C.F.R. § 218, pursuant to this authority. *See Pratico v. Portland Terminal Co.*, 783 F.2d 255, 262 (1st Cir. 1985). Relatedly, this Circuit has held that FRSA regulations also apply to claims under FELA. *See Nickels*, 560 F.3d at 430 ("FRSA can be achieved only if [federal rail safety regulations] are applied similarly to a FELA plaintiff's negligence claim and a non-railroad-employee plaintiff's state law negligence claim." (internal quotation marks omitted)).

Second, according to the Supreme Court, "[a] railroad's violation of a safety statute . . . is negligence *per se*." *McBride*, 131 S. Ct. at 2643 n.12. The regulation at issue is unquestionably one directed toward safety. *See* 49 C.F.R. § 218.91(a) ("The purpose of this subpart," which includes § 218.103, "is to prevent accidents and casualties that can result from the mishandling of equipment, switches, and fixed derails."). Both this circuit and sister circuits have allowed plaintiffs to submit evidence demonstrating the violation of FRSA regulations to establish FELA negligence claims. *See, e.g.*, *Sapp v. CSX Transp., Inc.*, 478 F. App'x 961, 965–66 (6th Cir. 2012) ("[FRSA] authorizes the Secretary of Transportation to prescribe regulations and to issue orders for every area of railroad safety supplementing laws and regulations in effect at the time of the FRSA's enactment. Under delegation from the Secretary, the [Federal Railway Administration] proposes and enforces the federal railroad safety statutes. Regulations implementing the statutes are located at Chapters 213 and 236 of Title 49 of the Code of Federal

Regulations." (citations omitted) (internal quotation marks omitted)); *Colonna v. Wheeling & Lake Erie Ry. Co.*, 129 F.3d 1263, 1997 WL 705092, at *2 (6th Cir. Nov. 5, 1997) (recognizing that a violation of 49 C.F.R. § 213.241(a) or (b) could "constitute negligence *per se* under FELA"); *see also, e.g.*, *Eckert v. Aliquippa & Southern R.R. Co.*, 828 F.2d 183, 186 (3d Cir. 1987) (permitting a plaintiff to submit evidence of a violation of 49 C.F.R. § 213.135(g) to establish a FELA negligence claim).

Third, and finally, lower court case law in this circuit also supports the conclusion that evidence of a violation of a FRSA regulation can establish a FELA negligence claim. *See, e.g.*, *Goines v. CSX Transp., Inc.*, No. 09-cv-672, at 11 (S.D. Ohio Apr. 12, 2011) (holding a violation of 49 C.F.R. § 218.35 constitutes a FELA negligence *per se* claim); *Waggoner v. Ohio Cent. R.R., Inc.*, No. 2:06-CV-250, 2007 WL 4224217, at *2 (S.D. Ohio Nov. 27, 2007) (allowing a negligence *per se* claim under FELA to proceed based on 49 C.F.R. § 240.305(a)(2)); *Hinkle v. Norfolk S. Ry. Co.*, 2:05-CV-574, 2006 WL 3783521, at *3 (S.D. Ohio Dec. 21, 2006) (allowing a FELA claim to proceed based on 49 C.F.R. § 229.119(a), and 49 C.F.R. § 229.45). With the propriety of Plaintiff's claim established, the Court turns now to the merits.

**B. Violation of 49 C.F.R. § 218.103 as Negligence *Per Se***

Plaintiffs have two avenues for proving liability in a FELA case. As one, "[a] plaintiff may demonstrate liability as a matter of law if he proves that a railroad company violated a safety statute that establishes an absolute duty on the railroad company." *Borger v. CSX Transp., Inc.*, 571 F.3d 559, 563 (6th Cir. 2009). As the other, without "a specific safety statute" on point, a plaintiff "can still prevail by proving the traditional common law elements of negligence: duty, breach, foreseeability, and causation." *Id.* (internal quotation marks omitted). Plaintiff in this

case asserts violation of 49 C.F.R 218.103, a safety statute. *See* 49 C.F.R. § 218.91(a). Negligence *per se* therefore controls the analysis.

Instead of having to prove the traditional elements of negligence, the requirements change slightly in the context of a negligence *per se* claim. Proof of the violation of a safety statue such as the one at issue here satisfies the duty and breach requirements. *See Kernan v. Am. Dredging Co.*, 355 U.S. 426, 444–45 (1958); *Ries v. Natl. R.R. Passenger Corp.*, 960 F.2d 1156, 1159 (3d Cir. 1992). The same goes for the foreseeability requirement. *See McBride*, 131 S. Ct. at 2643; *Ries*, 960 F.2d at 1158–59. Plaintiffs still must prove causation. *See McBride*, 131 S. Ct. at 2636. The Court turns now to the merits of the summary judgment motion, dealing first with whether Defendant violated 49 C.F.R. § 218.103, and next with the issue of causation.

### 1. Violation of 49 C.F.R. § 218.103

The regulation at issue, 49 C.F.R. § 218.103, requires Defendant to create an operating rule that complies with 49 C.F.R. § 218.103(b)(4). 49 C.F.R. § 218.103(a)(1). According to the language of 49 C.F.R. § 218.103(b)(4), railroad employees "operating or verifying the position of a hand-operated switch shall . . . [v]isually determine that switches are properly lined for the intended route and that no equipment is fouling the switches." The section goes further and essentially incorporates railroad operating rules into the Code of Federal Regulations: Any employee violation "of an operating rule which complies with the requirements of [§ 218.103 means] that person shall be considered to have violated the requirements of this section." *Id.* § 218.103(a)(1). In other words, if an employee violates and applicable operating rule, he violates 49 C.F.R. § 218.103. This leads to the two sub-issues with respect to 49 C.F.R. § 218.103 applicable in the instant case: whether Defendant enacted an operating rule in compliance with the regulation, and whether an employee of Defendant violated that operating rule.

As to the first issue, Plaintiff asserts that Defendant enacted NS Operating Rule 104 in compliance with 49 C.F.R. §§ 218.103(a)(1) and 218.103(b)(4). Defendant does not challenge this assertion. The record also supports it. *See, e.g.*, doc. 70-9 at 4 (Defendant's responses to Plaintiff's supplemental interrogatories) ("[T]he Norfolk Southern operating rule primarily relating to 49 C.F.R. § 218.103, as it relates to the activities of the train crew at the time of the alleged incident, was Operating Rule 104."). NS Operating Rule 104 provides that "[e]mployees operating switches by hand must ensure . . . switches are properly lined for the movement to be made." Doc. 70-7 at 1. Based on the express language of the regulation; on the express language of the operating rule; on the record; and on Defendant's failure to present an argument or evidence otherwise, the Court finds that Defendant created NS Operating Rule 104 to conform with 49 C.F.R. §§ 218.103(a)(1) and 218.103(b)(4).

As to the second issue, Plaintiff asserts that Capozzolo, an employee of Defendant, violated 49 C.F.R. §§ 218.103(a)(1) and 218.103(b)(4). Again, these sections of the Code of Federal Regulations—along with NS 104—require a railroad employee operating switches by hand to ensure that the switches are aligned in the proper manner. The parties do not contest that Capozzolo, as the conductor positioned on the ground, outside the railcar, was operating the track switches by hand; and that he owned the responsibility of ensuring the proper alignment of the switches before Plaintiff made the push from the lead track to track 25. Plaintiff contends, however, that Capozzolo did not do this, and that his conduct thus violated 49 C.F.R. §§ 218.103(a)(1) and 218.103(b)(4), as well as NS Operating Rule 104. Defendant agrees that Capozzolo violated these regulations and the operating rule at issue. The record supports this conclusion. In his deposition, Plaintiff testified that Capozzolo told Plaintiff that he— Capozzolo—failed to align the switches. Doc. 70-1 at 73; *see* doc. 70-3 at 37 (Capozzolo, in his

deposition, testifying that he did not recall saying that to Plaintiff). Capozzolo submitted his own written statement to Defendant shortly after accident. In it, he said that he "[a]pparently did not line [the] #24 Track back to [the] lead." Doc. 70-4 at 1. Also, Capozzolo was asked in his deposition whether he properly aligned—and ensured that he aligned—the track 24 switch back to the lead. He admitted that he did not. *See* doc. 70-3 at 38; *id.* at 40. Based on this, the Court finds that Capozzolo, an employee of Plaintiff, violated the safety regulations on point, and that Defendant was therefore negligent *per se*.

### 2. Causation

The issue of causation remains. A different standard of causation—more relaxed than that of common-law negligence claims—applies to FELA negligence claims. According to this standard, a common carrier "shall be liable in damages to any person . . . while he is employed by such carrier . . . for such injury . . . *resulting in whole or in part* from the negligence" of any of its employees. *McBride*, 131 S. Ct. at 2636. Accordingly, an employer will be liable under this standard "if its negligence played *any role* in causing the plaintiff's injury." *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 351 (6th Cir. 2002) (emphasis added); *see McBride*, 131 S. Ct. at 2644 (2011) ("[A] defendant railroad caused or contributed to a railroad worker's injury if [the railroad's] negligence played a part—*no matter how small*—in bringing about the injury." (emphasis added) (internal quotation marks omitted)).

The parties focus the bulk of their contentions on this point. Plaintiff asserts that Capozzolo's negligence in violation the federal regulations at issue caused, in whole or in part, his injuries. For support, he points to several sources. As one, he argues that Defendant violated a safety regulation enacted to prevent railroad employee injuries by ensuring that railcars travel onto the proper tracks; and that this violation led to the exact injury it sought to prevent—

Plaintiff's injury from the collision of railcars running into each other because of track misalignment. Defendant does not directly contest this point.

Plaintiff also points to the statement of Defendant's own employee, trainmaster, Joseph H. Williams, Jr. Williams conducted a post-accident investigation. He then provided a statement regarding his investigation at an internal meeting. The parties stipulated that his statement could be used in lieu of deposition testimony. Doc. 70-5 ¶ 3. Based on his investigation, Williams stated the following: "Mr. Capozzolo failed to properly line his route prior to his move. And again, by turning his back to the move, he failed to properly protect his shove. And those things directly contributed to the injury of a fellow employee." Doc. 70-6 at 8. Defendant does not contest the validity of Williams's statement or of the exhibit, only that his statement is not relevant to the issue. The Court disagrees; taken as true, Williams's statement does make causation—an issue in this case—more likely. It is thus relevant. Still, upon review, the Court places minimal weight on Williams's statement. On one hand, he conducted his investigation and came to his conclusions as part of an internal investigation by Defendant. Further, courts have looked to these kinds of investigations in determining causation. *See, e.g.*, *Goines*, No. 09-cv-672, at 15. On the other hand, he did not give his statement under oath and Plaintiff has not offered him as an expert capable of giving opinion testimony. In short, his statement informs the issue of causation but certainly does not carry the day.

Plaintiff further points to the testimony of Neil Palmer. In its answer to Plaintiff's interrogatories, Defendant identified Palmer as a witness who would testify that Plaintiff violated a number of operating rules on the date of the accident. *See* 70-9 at 5 (answer to interrogatory five). In his deposition, Palmer indicated that he has worked for Defendant since 1995. *See* doc. 74-1 at 5–6. At the time of his deposition, he worked in management for Defendant as a

trainmaster. *See id.* at 10–11. He supervised Plaintiff in 2012 and he has knowledge of Reed Yard, the site of the accident. *See id.* at 11. He testified to being familiar with Williams's report, as well as with the facts behind the incident at issue in this case. *See id.* at 22–24. He testified that the "route not being properly lined caused the collision." *Id.* at 25.

Based on the connection between the regulations Defendant violated and Plaintiff's injury; on the testimony and exhibits from Defendant's own employees; and on the evidence on the record, Plaintiff meets his causation burden—Defendant's failure to align the switch properly caused, at least in part, of Plaintiff's injuries. Even so, Defendant attempts to undercut causation with several arguments.

First, Defendant argues that Plaintiff's own conduct violated the primary duty rule. Based on this theory, an employee cannot recover when that same employee violated an operating rule, statute, or regulation that he had the primary duty of carrying out; and when this violation also, at least in part, caused the accident. *See, e.g.*, *Chi., St. Paul, Minneapolis & Omaha Ry. Co. v. Arnold*, 160 F.2d 1002, 1004 (8th Cir. 1947). Defendant bases this defense on Plaintiff's alleged violations of a different operating rule, LA-509, explained in the facts section and dealt with further below. Even assuming Plaintiff violated LA-509, it would not matter for the purpose of a primary duty defense. As Plaintiff points out, this circuit rejected the primary duty rule in 1947. *Keith v. Wheeling & Lake Erie Ry. Co.*, 160 F.2d 654, 657 (6th Cir. 1947) ("The 1939 amendment to the Federal Employers' Liability Act swept away assumption of risk as a defense. It also did away with the primary duty rule, which was one phase, among others, of assumption of risk."). As the *Keith* court pointed out, defendants put forth the primary duty rule as an assumption-of-risk argument veiled by a different name. *Id.* Not only has this circuit rejected assumption of risk as a viable FELA defense, the Supreme Court has done so too. *See,*

*e.g.*, *McBride*, 131 S. Ct. at 2646 (Roberts, C.J., dissenting); *Norfolk S. Ry. Co. v. Sorrell*, 549 U.S. 158, 168 (2007).

Second, Defendant asserts the sole cause defense. This defense shields a railroad employer from liability, but only "[i]f the employee's own negligence was the sole cause of the accident." *Toth*, 306 F.3d 335, 351 (6th Cir. 2002). Contrary to Plaintiff's assertion, this rule does not conflict with the relaxed standard of causation at that applies to FELA cases. They are mutually exclusive: "[i]f the plaintiff's negligence was the sole cause, then the [employer's] violation . . . could not have contributed in whole or in part to the injury." *Id.* Defendant asserts that a genuine issue of material fact exists as to whether Plaintiff's own negligence serves as the sole cause of his injuries. It points to two of Plaintiff's alleged safety violations for support, one of which can be easily turned aside. Defendant argues that a question of fact exists as to whether Plaintiff violated LA-509, which requires the Engineer—in this case Plaintiff—to advise the hand-switch operator to double check the alignment of the switches. Even assuming Plaintiff violated this rule, this would not break the chain of causation between Capozzolo's negligence and Plaintiff's injury. For one, LA-509 and the operating rule Capozolo violated, NS Operating Rule 104, amount to the same set of directions: make sure the switches are properly aligned. Plaintiff's alleged violation of LA-509 thus could not have been the sole cause of his injuries. Stated another way, if Capozzolo would have aligned the switches in compliance with the regulations, Plaintiff would not have shoved onto track 24. This renders Defendant's first sole cause argument ineffective.

Defendant's second argument in support of its sole cause defense merits more attention. It argues that a reasonable jury could conclude that Plaintiff violated NS Operating Rule 509, which governs how far an engineer should travel on his or her initial shove. According to

Defendant, an issue of fact remains as to how far Plaintiff traveled on his shove. This is material, according to Defendant, because track 25 also had railcars on it. Thus, as Defendant sees it, even if Capozzolo aligned the switches properly and Plaintiff shoved onto track 25, as the crew planned, it is possible that Plaintiff still would have fallen victim to a collision because of the cars on track 25. In other words, depending on how the issues of fact are resolved, a reasonable jury could conclude that the collision would have occurred regardless of Defendant's negligence, making Plaintiff's own negligence with respect to his push length and NS Operating Rule 509 the sole cause of the accident. This argument fails for a couple of reasons.

First, Defendant has not presented evidence that would come close to establishing the location of the cars on track 25. The only piece of evidence Defendant points to on the record is from Capozzolo's post-accident hand-written statement. He said that he reminded Plaintiff that track 25 had cars on it; he followed this up by writing that utility brakeman Schreiber stated "we should be good for at least 10 cars." Doc. 70-4 at 2. In Defendant's estimation, this means that railcars were sitting approximately ten cars into track 25. Doc. 73 at 5. As a general matter, the Court disagrees with Defendant's conclusion that there were railcars ten cars into track 25. The utility brakeman's statement that the crew was "good" on its initial shove "for at least 10 cars" does not necessarily convey the exact position of cars on track 25. Even assuming it did, and drawing the inference in Defendant's favor, the single statement that Defendant points to only creates "some metaphysical doubt" as to the location of the cars on track 25. *Matsushita*, 475 U.S. at 586. This, then, is not enough to create an issue of fact. And it is also not enough to create a *genuine* issue of fact. Defendant's theory leads the Court down a road of postulation and guessing as to how things might have played out. Based on the record, the Court has already concluded that Defendant was negligent and that Plaintiff suffered injury, at least in some part,

19

because of that negligence. Defendant's posed counterfactual—that finds little support in the record—does not break the chain of causation and does not change the Court's conclusion.

Second, even assuming all the facts Defendant argues and drawing all inferences in Defendant's favor, it would still not be enough to break the chain of causation in this case. Drawing all inferences in Defendant's favor leads to the following conclusions: (1) Plaintiff was only authorized to move, at most, ten car lengths; (2) Plaintiff shoved 349 feet prior to impact, *see* doc. 73 at 4 ("Defendant will present evidence at trial, based on the event recorder data, that Plaintiff actually shoved 349 feet prior to impact . . . ."); (3) this violated NS Operating Rule 509, which directed Plaintiff to stop at "one-half the distance last received," or at 250 feet, doc. 70-2 at 1; *see id.* ("The distance of the movement must be specified in 50 foot 'car lengths' and the movement must stop in one-half the distance last received unless additional instructions are received."); (4) railcars were sitting approximately ten cars into track 25. Defendant argues that all of this adds up to show that, even if Capozollo properly aligned the switch for track 25, Plaintiff would have run into the cars on track. The math does add up in Defendant's favor: Plaintiff would have pushed 8 cars—or 400 feet of car—onto track 25, and because he pushed more than 100 feet, he would have run into the railcars that were, assuming Defendant's argument correct, 500 feet into track 25.

Plaintiff successfully rebuts this explanation. As Plaintiff points out, in order for Defendant's counterfactual to play out, employees Schreiber and Capozzolo would have to have violated another federal regulation. According to 49 C.F.R. 218.99(b)(3), railroad employees must provide "point protection" during the shove motion, and they must do so by "[v]isually determining that the track is clear," and by "[g]iving signals or instructions necessary to control the movement" of the shove. In other words, as Plaintiff points out, this regulation required

Capozzolo and Schreiber to stand outside of the car and guide Plaintiff safely to where he was going; and, if necessary, communicate to him to stop to prevent a collision. The record indicates that both were in position—on track 25—to guide Plaintiff accordingly. *See, e.g.*, doc. 70-3 at 33–34 (indicating that Schreiber was in position on track 25 in compliance with 49 C.F.R. 218.99(b)(3)). The problem, however, in reality was that the switch was lined for the wrong track, and that Plaintiff shoved onto track 24, not track 25—where both Schreiber and Capozzolo were in position to guide Plaintiff. Based on this, Defendant's counterfactual only works to make Plaintiff's alleged negligence the sole cause of his injury if the Court assumes something for which Defendant does not—and cannot—offer any evidence to support: that *both* Schreiber and Capozzolo would have violated a separate federal regulation in guiding Plaintiff's shove onto track 25. Because the Court cannot do so, Defendant's attempt to create genuine issues of material fact, as well as it arguments against causation, fail to convince the Court.

In short, the record establishes that Defendant was negligent in violating a federal safety regulation aimed at railroad employee safety; and that this contributed, at least in part, to Plaintiff's injuries.

## IV. CONCLUSION

For the reasons stated, Plaintiff's motion for summary judgment, doc. 69, on the issues of negligence *per se* and causation is **GRANTED**. Any issues relating to the nature of Plaintiff's injuries and the related damages remain for trial.

**IT IS SO ORDERED.**

   1-13-2014

**DATED**

             **EDMUND A. SARGUS, JR.**
             **UNITED STATES DISTRICT JUDGE**